I'll be mindful of the clock, but I'd like to reserve two minutes for rebuttal, please. Okay. Keep an eye on the clock, and we'll try to help you. Will do, Your Honor. Close enough for government work. That is the leitmotif that weaves its way through each of the three issues, each of the three sentencing issues now before this Court. Close enough for reckless endangerment when there's cars in the path, but no car is identified that actually is impacted by the flight of my client during the brief court. Although we're actually impacted, but do you agree that the district judge reviewed the actual video and, in his opinion, the actions of your client endangered people? That's a direct observation, not just a generalization. What's the matter with that? Your Honor, I do agree that District Judge Tiger did review the video, and I do agree that he observed that there were cars on the road. I disagree that he identified any car that was actually impacted, as the guideline requires. Does he actually have to have an accident to have endangerment enhancement? No, Your Honor. Under the guideline, under the plain language of the guideline, there must be another person, a specific person, for whom the action caused the risk of injury or death, and there was no such person in this case. I mean, but we've all looked at the video. For example, there's a car at 212 in the video, right? Your Honor, there are three cars, I believe, that are at issue in this case. There's a car at the first intersection where there's a U-turn taken. You can see a car coming, the headlights of a car coming. There's a gray car as my client drives down the road away from that U-turn, and then there's a third car at the stoplight where the crash took place. None of those three cars, the government has failed in its burden to prove that any of those three cars were impacted by my client's flight. How fast was your client going? At that time, Your Honor, he was going well above his speed limit. I don't think it's in the record how far he was going during the 25 seconds that he was driving. No, how fast was he going? Excuse me, I don't believe it is in the record how fast he was going during the 25 seconds. At every second, but we can see that there were certainly many instances with cars on the road where your client was going very fast, right? That is a correct fact. There were cars on the road, and my client was going quickly. He was going, I would concede, above the speed limit for that surface street. What I do not concede, and I think the government has failed in its burden, is to prove that any of those three vehicles were affected by that flight. What do you mean affected, counsel? Do they have to scream? Do they have to back up? What do they have to do? I mean, if you're in there, these three vehicles, people are sitting in the car, you see someone coming gently toward the direction at a very high rate of speed with the police in back of them. Isn't it normal that they would be apprehensive, concerned, that they might be impacted by your client veering to the right or the left? Yes. What's the matter with that? That is absolutely true, and that is not the facts of this case. And none of the three vehicles in my client come behind. The only car to leave. You're saying they didn't actually end up doing that, but you don't know what they thought. I guess what I'm troubled with, you seem to be suggesting that in order to have an enhancement here, you have to have the occupants of the three vehicles in question come and testify to say, oh, I was terrified. I don't think that's what the guidelines provide, is it? Absolutely not, Your Honor. I think if the government had met its burden and shown that one of the cars had a slam in its brake as it came in at an intersection due to my client's U-turn, that would be sufficient. There were two officers who could have testified, who could have submitted declarations, who did not. My client submitted a declaration at ER 13, and he reported that no vehicle was affected. That's a self-interested kind of a thing. That's not what we look at, is it, in this type of evaluation? Oh, absolutely, Your Honor. It's the only evidence in the record, that and the video. But, counsel, the guideline provides if the defendant recklessly created a substantial risk of death or serious bodily injury to another person, to go to Judge Smith's point, that doesn't require injury to another person, the death of another person. It requires, by his actions, his acting recklessly and creating a substantial risk. The — I mean, from my review of the video, I just don't see that the judge clearly erred in his findings. Well, Your Honor, I believe that — I respectfully disagree, and I'll use the example of the third vehicle as an example. The third vehicle was stopped at a stoplight when the policeman came upon the car that was crashed by my client. We have no idea where that vehicle was as my client went through that intersection and crashed. It could have been well down that road, far, far away from any impact or any consequences of my client's actions. And, Your Honor, I would report that — I would view that that did not cause reckless endangerment of that car. Your Honor, again, as the district judge who made the evaluation here, you've got to show some clear error here. And he looked at the video. He saw where these cars were, and he made a judgment that given the rate of speed that your client was traveling at and where these folks were located, that the enhancement was appropriate. Under the case law and under the reading of the actual guideline that my colleague has given you here, what's wrong with that? Your Honor, I think it was wrong because none of those three vehicles were actually affected. The only — How do you know that? From the video. Do they have to be hit? No. Is that what you're saying? No. From the video, from the uncontroverted declaration of my client. And it's not my client's burden. It's the government's burden. And they failed to — Didn't the judge say he found your client not credible? He did, for no apparent reason. But this is clear error review. I think you say in your brief that you don't challenge any of the factual conclusions of the district court in your appeal. But that seems to be exactly what you're doing. And whatever happened below, we're reviewing the district court's factual findings, are we not? Thank you, Your Honor, because that provides an interesting segue to why the district court erred. He erred because those findings, as it were, were sounded in his decision that it was not necessary to identify another person. He made that clear. Okay. So you make this point based on the text. Is your claim that there wasn't another person in these moving cars? No, Your Honor. My claim is that the district court erred when he found that another person need not be — a specific person need not be identified, that just driving recklessly in an urban neighborhood is enough. And then by identifying — he didn't identify a car. The reason why the government conceded that he didn't identify a vehicle, the government said at dash cam footage at 221, it is unclear what specific car the district court referred to. That is not what this guideline requires. There were serious consequences. There's 8 to 13 months difference in this guideline. So your position, I gather, is because your client, of course, who is totally self-interested here and who the judge found not credible, because he said it was different, the judge is bound by that because you don't have any people in the three cars testify to the contrary? No, Your Honor. My position is when my client submitted that declaration, the court had no basis to find him not credible. He didn't testify. He had never — By the video. Your Honor, none of the three vehicles on the vehicle were actually impacted by my client's flight. And there were two officers — Impacted in what sense? You said it didn't — they didn't have to have a crash. You don't know one way or another how they felt, whether they were terrified when they saw your client careening toward them, right? It did not create a substantial risk of death to any of those three vehicles, Your Honor. And I know that has — I'm not going to save any of your time. Entirely up to you. Would you mind if I ask a question on another issue? No, of course. So, I had a question for you on the Jason issue. Yes, Your Honor. So, I want to make sure I clearly understand part of your argument. There's no question that you objected to the Jason data at sentencing. And you said either don't consider it or conduct an evidentiary hearing first, or have the Sentencing Commission provide additional information. Is that a fair characterization? It is, Your Honor. So, this is my question. Is it your position that in every case where — that we should rule in such a way that in every case where that was the scenario, the judge is forbidden to consider the Jason data unless they held an evidentiary hearing along the lines that you suggested, that their two choices are conduct an evidentiary hearing or can't rely at all on any objected-to Jason data no matter what? No, Your Honor. It is a much more — So, what makes your challenge narrower than the way I've just phrased it? Your Honor, first, I had shown there were specific issues with this data, most specifically the exclusion of all custodial sentences. Right. But that is something that occurs with every aspect of the Jason data, right? Yes. So, someone making that objection would be essentially be able to make that any time the district judge was considering any Jason data because that's always a characteristic, right? Correct. Okay. Judge Smith, I would. I would. We'll give him some time.  Okay. I don't want to eat your rebuttal. Thank you, Your Honor. I appreciate it. He really does, but we'll give you some more time. Thank you, Your Honor. Thank you. All right. Let's hear from the government. Good morning, Your Honors, and may it please the Court. Simon DeCarvalho for the United States. The record in this case makes plain that the district court correctly applied the sentencing guidelines, understood its discretion to impose a sentence below the guidelines, and considered and reasonably rejected each of Mr. Brewster's three arguments en route to imposing within guidelines a 46-month sentence that was substantively reasonable. Counsel, let me ask you this. At least as I read it, the defendant here is essentially asking the court to make a determination based on a generalized damage. Do we really need to get to that here in light of the facts of this case, what the judge saw in the videos and so on? It can be just related to this incident. Is that correct? That's exactly right. Our primary submission is that the district court made exactly the factual finding that Mr. Brewster says is required under 3C1.2. He says that a district court is required to identify specific individuals who are placed in apprehension of death or serious bodily injury. The district court in this case watched the dash cam video live in court. That's ER 48-49. And then after watching the video, made a finding at 51-52 that there were numerous drivers on the road during the course of Mr. Brewster's flight, that he was driving out of control, and that he came close enough to those individuals that the enhancement is warranted. So to follow up on Judge Smith's question, the government's position is the dispute over the meaning of this particular guideline, we could assume without deciding that the defendant's is correct and just look at the record and say the judge made this exact finding even if the defendant is correct as to what the guideline requires. That's exactly right. Which car? I think that's one problem in terms of these findings is we're trying to determine which of these cars is enough. Is it sufficient just to say generally or did the district court have to identify at least a car? Well, I think the district court did identify multiple cars. It said numerous drivers. I think this Court's task is to review the evidence that the district court reviewed, which are Mr. Brewster's affidavit and the dash cam video, and then to determine whether the factual finding that there were numerous drivers impacted by Mr. Brewster's conduct during the flight was clearly erroneous. I think I would point to two cars. First is the car at 157, which is the car that's oncoming as Mr. Brewster makes the U-turn. You can clearly see at 151 in the video, you can clearly see that the car stops as Mr. Brewster pulls the U-turn by it. That car, had it been distracted, might not have stopped, might have caused an accident. I think this Court's cases are clear that things of that nature cause sufficient risk. Mr. DiCavario, the — I mean, we've seen the cars. I think we think the district court's seen the cars. Do we have to have findings that identify the specific cars that the district court has seen? Well, again, I think the question is really from the totality of the record, are you able to determine that the district court found specific vehicles? I — Mr. Kaler pointed out the district court mentioned this car at 221, which may have been, I think in our understanding was perhaps just a slip of the tongue. The 212 is where the car is at the intersection. Again, 151 is the car at the U-turn. There's no question there's a car at 212. There's no question there isn't a car at 221, yes. That's right. But I don't think that's material because, again, this Court can review the video, see with its own eyes, and make a — you know, understand what the district court was finding. And based on the government's understanding of the guideline, in this case, where the district judge viewed the evidence, saw the cars starting, stopping, turning, that's enough. And the other side has to show that that's clear error, right? That's right. And I gather the government takes the position they have not shown that. I'm not even sure they've attempted to show that. But, yes, that's our position. They have not shown that. But that is also something we could assume without deciding. We could assume that they have raised the clear error issue in their briefs, and even if they have, we could as a hypothetical matter decide that there is no clear error. We would encourage you to find that this — the factual finding here that people were endangered was not clearly erroneous, yes. I can turn to the other issues, if the Court would like. So I'll go to the Jason question that Judge Bennett asked about. Mr. Brewster's objections to the Jason data went, as the district court here recognized, to its sort of probative value and the weight that should be applied to it, not its underlying reliability. Mr. Kaler has pointed out, you know, a series of methodological issues that he wishes were different in the Jason analysis, but the district court is fully capable to and, in fact, in this case did consider those methodological issues in assigning weight to the Jason value, Jason data. None of those show that — none of those objections carry Mr. Brewster's burden to show that this data is inherently unreliable. That may be true, counsel. It is odd, though, that the Sentencing Commission has decided in coming up with these statistics not to count — not to factor into the numbers someone who doesn't get a custodial sentence. I mean, isn't that a little odd? I think it's a reasonable choice for the commission to have made. You might imagine a district court judge in deciding what punishment to impose sort of making a binary decision whether a probation-only sentence or a custodial sentence is warranted. And then under 3553a6, you might imagine that the relevant question as to similarly situated defendants would be to only look at those with custodial sentences. But to get to the point more directly, Mr. Kaler and Mr. Brewster were fully able to run the numbers the way they wanted to in this case. The PSR, paragraph 104 to 107, lays out the Jason data here. I mean, they can run the numbers. Anybody can run the numbers. Anybody can run the numbers. And here on this record, this question was raised and the district court said, I'm taking into account the putative flaws identified by the defendant in relying on the Jason data. Sure. That's right. But I don't think, again, Mr. Brewster is raising a constitutional claim that this data is so inherently unreliable that it violates his due process right for the district court to have considered this data. I don't take him to be arguing that, you know, the district court didn't adequately explain his reasons or anything like that. And again, just to briefly touch on that point, there were 490 custodial sentences in the Jason data here. There were five noncustodial sentences. That's reported in the PSR. The average, if you factor in those five noncustodial sentences at zero value, goes from 45 to 44.55. It's a pretty trivial difference in this case. In this case. In this case. Is there any suggestion that courts are using the Jason data to determine the terms of noncustodial sentences? I'm not aware that they are. I don't think the Jason data would even report out if there were only noncustodial sentences, so no. So, I want to be sure I understand your position correctly. As far as the government is concerned, the judge disclosed he wasn't in any way bound by Jason data. The judge said he had looked at them. He heard the objections from Mr. Brewster, said he would take that into account. If I recall correctly, he specifically said he didn't rely on the Jason data in making the sentence. Is that correct? Well, the judge said that he, at ER-63, that he was going to or would not be performing the 3553 analysis without considering the Jason data. That's why we haven't made a harmless error argument. But I do agree with Your Honor that the district judge didn't impose this sentence for the sole reason that Jason said 45. If I'm recalling correctly, and correct me if I'm wrong, I believe the district court said if he was doing something wrong here, he wanted the Ninth Circuit to tell him? He did say that. Yeah. But we do not think the district judge was doing anything wrong by considering this data. This Court has a long line of cases, the Marin Cuevas line that we cite in our brief, where district judges rely upon government data from various sources, you know, and basically the thrust of the due process line of cases, the heartland of those cases, is where, you know, there's some inherently unreliable testimony by a co-defendant or a co-conspirator, inculpatory testimony. This, the data here has no reason to be biased against Mr. Brewster. The Sentencing Commission is a reliable narrator. Let me ask you that. Yeah. The clock seems to have disappeared here. Yes. What's our number here? Sorry. I just need to. Yeah. Wayne, there's just nothing there. Just give us a second. Okay. How much time have we got for this gentleman? Forty seconds? Okay. Go ahead. All right. If there's nothing further on that one, I'll just briefly touch on the third issue, the downward departure issue. As my friend said below, the district court correctly characterized his request, which was that the court impose a below-guideline sentence on the basis that his flight from police, in the totality of the circumstances here, was essentially involuntary. The district court considered that argument, understood it, rejected it on the merits, and because it understood its discretion to go below the guidelines, this court cannot review the denial of that departure as such. It can only review the substantive reasonableness of the overall sentence. I mean, your friend specifically said, I think the court correctly characterized it. That's right. So I think we're out of time. So unless either of my colleagues have additional questions, we thank the government. Thank you. What do we, have you got, maybe you can just, you got the clock there? Yeah. Okay. So let's do this. We're going to give you two minutes. Very generous, I might add. Very, very generous. I appreciate you, Your Honor. Thank you. If you'll just kind of flag when there's like 30 seconds left, you don't need to stand or just kind of raise your hand so we'll know, and then wave it so he can see it, too. Okay? Have you got a clock there? Can you see a clock? No, Your Honor. Okay. I can't either, so. But I will be cognizant of the time.  All right. Please. I'd like to address three questions that the panel requested. First, must the district court identify a specific vehicle? Yes. Did it? No. And because it failed to do so, and that was sounded in its decision, that there need no be a specific person, that's its legal finding, it erred. And is that clear error? Your Honor, I don't think it needs to get to clear error because the district court found that it did not need to find that any specific person was threatened, which is legal. In case it would suggest that that would be clear error? No. I don't think so, because it's a factual finding, really. It's a factual finding sounded in legal error. Your Honor, you asked if the district court said it would make a decision not relying on JSIN. At ER 68, the district court could not have been more clear that it was expressly and specifically relying on JSIN data. Indeed, it found 46 months, one month above the average. So, this case is perfectly teed up. It heavily relied on JSIN. And finally, Judge Bennett, to your question, my remedy sought in this case is very limited. At ER 68, I asked for the sentencing data. Perhaps there would have been no hearing because the data would have revealed there were no problems. The due process error was not in the JSIN data. The due process error was in the denial of the defendant's right to test that data in a way that no other evidentiary issue in the Federal courts enjoy that type of protection. And so, we would ask for a limited remand to allow us to have that data analyzed. I think that's addressed those questions, unless the court has further questions. I think not. Thanks, both of you, for your argument. We appreciate it. We're going to take just a quick break for the
judges: SMITH, BENNETT, JOHNSTONE